UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PETITION OF RJF INTERNATIONAL CORPORATION FOR EXONERATION FROM OR LIMITATION OF LIABILITY, CIVIL AND MARITIME

C.A. NO. 01-588 S

## CLAIMANT'S MOTION TO APPROVE SETTLEMENT

Claimant Kimberly M. Hanna, duly appointed plenary guardian of the person and the property of James Martin Avery ("Avery"), moves this Court for an order approving a settlement of her claims against petitioner arising out of injuries suffered by Avery in an incident that occurred on August 11, 2001, while Avery was employed as a seaman by petitioner. The terms of the settlement itself, and other related conditions or arrangements, including those that will preserve Avery's entitlement to various government benefits that he is now receiving, are as follows:

1. A payment by petitioner to claimant of $5,400,000.00;

2. Payment by petitioner of all medical bills for treatment rendered to Avery up to January 23, 2005 for his incident-related injuries;

3. Execution by claimant of a full release to petitioner;

4. Dismissal of all actions presently pending in federal and state court pertaining to any claims concerning the damages and injuries sustained by Avery;

5. Establishment of a supplemental needs trust for Avery under 42 U.S.C. §1396p(d)(4)(A), so as to preserve his eligibility for Medicaid benefits;

6. Establishment of a Medicare Set Aside Arrangement ("MSA") so as to preserve Avery's eligibility for Medicare benefits;

7. Payment by claimant to claimant's counsel of attorneys' fees in the amount of $1,380,000.00, and reimbursement by claimant to claimant's counsel of litigation costs and expenses advanced in the amount of $112,093.63;

8. Cancellation and discharge of the limitation bond filed by petitioner.

WHEREFORE, claimant requests that this Court enter an order:

1. Approving the settlement of all claims between claimant Kimberly M. Hanna and petitioner arising out of injuries suffered by James M. Avery on August 11, 2001 for a payment of $5,400,000.00;

2. Authorizing claimant to execute a full release of all claims against petitioner;

3. Directing the parties to execute stipulations dismissing with prejudice this limitation of liability proceeding and the personal injury case filed by claimant in Newport County Superior Court;

4. Approving and directing the establishment of a supplemental needs trust for Jamie under 42 U.S.C. §1396p(d)(4)(A), in the form as attached to claimant's memorandum, so as to preserve his eligibility for Medicaid benefits;

5. Approving and directing the establishment of a Medicare Set Aside Arrangement ("MSA"), as described in claimant's memorandum and in accordance with the requirements of the Centers for Medicare and Medicaid Services, so as to preserve Avery's eligibility for Medicare benefits;

6. Approving and directing payment of attorneys' fees and reimbursement of litigation costs and expenses advanced;

7. Discharging the guardian ad litem from any further responsibilities in this

matter, and directing that his fees be paid by petitioner or its insurer;

8. Canceling and discharging the limitation bond filed by petitioner.

9. Granting such other relief as may be necessary to consummate the settlement.

The basis for this motion is set forth in the accompanying memorandum.

CLAIMANT
KIMBERLY M. HANNA
By her Attorneys

John S. Foley #2060
Decof & Decof, P.C.
One Smith Hill
Providence, RI 02903
Telephone (401) 272-1110
Facsimile (401) 351-6641

John W. Merting
(Pro hac vice)
Law Offices of John W. Merting, P.A.
Suite 39 – Harbourtown
913 Gulf Breeze Parkway
Gulf Breeze, FL 32561
Telephone (850) 916-9645
Facsimile (850) 916-9787

Andrew V. Buchsbaum
(Pro hac vice)
Friedman & James LLP
132 Nassau Street, Suite 900
New York, NY 10038
Telephone (212) 233-9385
Facsimile (212) 619-2340

**CERTIFICATION**

I hereby certify that a true and accurate copy of the within document was sent by regular mail, postage prepaid, from Decof & Decof, P.C., One Smith Hill, Providence, RI 02903, to **Thomas Clinton, Esq. and Kenneth Chiarello, Esq.,** Clinton & Muzyka, P.C., One Washington Mall Suite 1400, Boston, MA 02108; **Michael R. Hagopian, Esq.,** 212 Greenwich Avenue, Warwick, RI 02886; **Dennis J. Roberts, II, Esq.** 40 Westminster Street, Suite 305, Providence, RI 02903; **Anthony DiGioia, Esq.**, Assistant U.S. Attorney, Fleet Center, 50 Kennedy Plaza, 8th Floor, Providence, RI 02903; **Clifford Pierce, Esq.**, Assistant Regional Counsel, U.S. Department of Health and Human Services, 2250 John F. Kennedy Federal Building, Government Center, Boston, MA 02203, and **William A. Poore, Esq.**, Poore & Rosenbaum, Commerce Center, 30 Exchange Terrace, Providence, RI 02901-1117 on the 18th day of October, 2005.

Avery P109

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PETITION OF RJF INTERNATIONAL CORPORATION FOR EXONERATION FROM OR LIMITATION OF LIABILITY, CIVIL AND MARITIME

C.A. NO. 01-588 S

**CLAIMANT'S MEMORANDUM IN SUPPORT OF MOTION TO APPROVE SETTLEMENT**

Claimant submits this memorandum in support of her motion seeking this Court's approval of a settlement that will resolve all of her claims against petitioner arising out of injuries suffered by her son and ward James M. Avery ("Jamie") as a result of a work-related incident that occurred on August 11, 2001. The settlement was reached during a mediation on January 17 and 18, 2005 and was memorialized in a letter from the mediator, William A. Poore, Esq., dated January 25, 2005, a copy of which is attached to this memorandum as Exhibit A. The various terms of the proposed settlement, as well as the mechanisms that claimant will employ to preserve Jamie's eligibility for the government benefits that he is now receiving, will be addressed separately.

1. Background

This limitation of shipowner's liability action was commenced in response to a tragic accident involving Jamie, a seaman employed by petitioner, on August 11, 2001. While engaged in washing down the vessel's exterior, Jamie was caused to fall from the vessel, strike his head on the dock, and become submerged underwater for seven to ten minutes before being pulled from the water. He sustained a severe and permanent anoxic brain injury. Over four years later, he remains as an inpatient in a skilled care facility. Both this Court and the First Circuit have written extensively regarding this matter. See

In re RJF Int'l Corp., 261 F. Supp.2d 101 (D.R.I. 2003) (Smith, J.), aff'd, 354 F.3d 104 (1st Cir. 2004); In re RJF Int'l Corp., 334 F. Supp.2d 109 (D.R.I. 2004) (Smith, J.); In re RJF Int'l Corp., 332 F. Supp.2d 458 (D.R.I. 2004) (Smith, J).

In August of 2004, this Court granted claimant's request to lift the stay of other proceedings it had ordered on May 8, 2002, for the limited purpose of allowing claimant to file her personal injury claims on behalf of Jamie in the state court pursuant to the "saving to suitors" clause, 28 U.S.C. §1333. Claimant's state court suit, containing Jones Act, unseaworthiness, and maintenance and cure causes of action, was filed on August 5, 2004. Pursuant to this Court's order entered on August 12, 2004, petitioner answered the case and filed a third-party complaint, and third-party defendant Clarke Cooke Inc. filed an answer, but all further proceedings in that action are presently stayed.

2. The settlement terms

This claim was settled at mediation late in the day on January 18, 2005, after two days of discussions, for the sum of $5,400,000.00[1], plus the satisfaction by petitioner of all unpaid medical bills incurred regarding Jamie's care and treatment through January 23, 2005.

Claimant submits that the settlement is fair and reasonable, in the best interests of Jamie, and should be approved by this Court. Petitioner has strongly contested claimant's allegations of negligence and unseaworthiness as the cause of Jamie's fall, and the outcome of claimant's liability claims, as well as the limitation of liability issues still pending in this Court, is uncertain. Moreover, Jamie's entitlement to maintenance and

[1] Petitioner's insurer has advanced $10,000 to claimant for the purpose of assisting in relocating Jamie to Massachusetts, where he now resides. Therefore, the net payment to be made to claimant is $5,390,000. Additionally, since the settlement was reached, petitioner has agreed to pay certain additional medical bills which it had previously disputed.

cure benefits from petitioner will end as soon as he is determined to have reached maximum medical recovery, and from that point on he will be dependent on government programs and his own resources to provide for his ongoing care. Claimant believes that the proposed settlement, in combination with the government benefits that Jamie currently receives, such as Medicare and Medicaid, which he will continue to receive under the proposed supplemental needs trust and Medicare set aside arrangement ("MSA"), will adequately provide for Jamie's needs. In fact, given the adversarial and problematic nature of the provision of cure benefits to Jamie over the years since his injury, claimant believes that Jamie will receive better care after the settlement than he had been receiving before it. Claimant believes that the funds that will be available to Jamie as a result of this settlement will make a significant difference in his quality of life.

Claimant requests that she be authorized to execute a full release of all claims against petitioner on behalf of Jamie, and that she be authorized to dismiss with prejudice all claims that she has filed in any court on behalf of Jamie.

3. <u>The supplemental needs trust</u>

Supplemental needs trusts have become standard settlement planning vehicles for disabled individuals who receive medical assistance from state Medicaid programs, as Jamie does. Assets held in a trust established under 42 U.S.C. §1396p(d)(4)(A) are not considered to be resources or income of the Medicaid recipient, and therefore do not disqualify the recipient from eligibility for Medicaid benefits.

Claimant has retained the services of an attorney experienced in the creation of supplemental needs trusts, Steven M. Cohen, Esq. of Boston, Massachusetts, and the trust drafted by Mr. Cohen is attached to this Memorandum as Exhibit B. The purpose

of the trust (¶ 2.1) is to supplement government and charitable sources of benefits and services to provide for Jamie's welfare. The trustees (¶ 6.1) are claimant and Chris A. Milne, a Massachusetts attorney who is experienced in the needs of disabled children and adults and frequently serves as a professional trustee in cases such as this. The trust further provides (¶ 6.4) for an investment trustee to manage the trust corpus, and requires that such investment trustee be an institution with at least $500 million under management and which is actively involved in the business of managing assets for others. The trust names Merrill Lynch Trust Company, FSB, a federally chartered savings bank, as the initial investment trustee. As required by 42 U.S.C. §1396p(d)(4)(A), the trust provides (¶ 5.1) that, upon Jamie's death, the trust will pay any remaining trust principal and undistributed (but accrued) income to any state which has paid Medicaid benefits for Jamie's care, up to an amount equal to the total amount of Medicaid benefits paid on behalf of Jamie. Any trust property and undistributed income remaining after any Medicaid program has been reimbursed will be distributed either as Jamie may appoint by will or to claimant and Jamie's sister Stacy.

4. <u>The Medicare Set Aside Arrangement</u>

A Medicare set aside arrangement ("MSA") is customarily employed in workers' compensation case settlements that include payments for future medical treatment. In such settlements, a Medicare-eligible injured party is required to "set aside" a sum of money from the settlement into a special account to pay for future medical treatment required by the injury which is the subject of the workers' compensation claim; this relieves Medicare from the responsibility of paying for such claim-related treatment.

The statutory basis for Medicare's requirement for MSA's is the Medicare Secondary Payer statute, 42 U.S.C. §1395y(b).

After the mediation, counsel for petitioner for the first time contended that the MSA requirements and procedures from the workers' compensation arena were applicable to the personal injury settlement the parties had just reached. Prior to the mediation, counsel for claimant had received a letter from an official of the Centers for Medicare and Medicaid Services ("CMS") in June of 2003 that stated that the MSA requirements did not apply to a Jones Act settlement or judgment. However, after reviewing this issue in light of petitioner's contention that the MSA requirements did apply, CMS informed counsel for claimant by letter dated March 24, 2005 (attached to this memorandum as Exhibit C), that the MSA requirements did apply and claimant would have to either establish a CMS-approved MSA or forfeit Jamie's Medicare eligibility for future medical services related to his brain injury until his expenses for such future medical services equaled the amount of his settlement. Claimant made the obvious choice to establish an MSA, and the delay between the settlement agreement in January and the filing of the instant motion has been due primarily to the time required for CMS to reach its determination that an MSA was required, claimant's preparation and submission of a proposed MSA to CMS, CMS's review of that proposed MSA, and its recent decision approving the terms of an acceptable MSA.

CMS's letter, dated September 6, 2005, setting forth the terms of an MSA acceptable to CMS, is attached to this memorandum as Exhibit D. As stated in the letter, the account must be funded by an initial deposit of $66,012 upon settlement, and annual payments thereafter in the amount of $33,006 for the remainder of Jamie's life. All funds

must be placed in an interest-bearing account and must be available to pay for medical services for Jamie that would otherwise be covered by Medicare.

Claimant intends to fund the MSA by arranging for the purchase of an annuity from the proceeds of the settlement. Claimant proposes that the MSA be administered by Affiance Partners, LLC, a joint venture between Health Advocates, Inc. and the Garretson Law Firm LLC, of Cincinnati, Ohio, two entities that have extensive experience in the creation and administration of MSA's. The fees of Affiance Partners to administer the MSA and complete all necessary accounts and reports are $1,950 for initial set-up and $750 per year (with a 3% annual cost of living increase) thereafter for as long as the MSA is in existence. Attached as Exhibit E is a quote that has been provided for a New York Life Insurance Company annuity. This quote shows that it will cost $460,499[2] to purchase an annuity that will (1) make the "cash seed" payment of $66,012; (2) make yearly payments to Jamie's MSA account in the amount of $33,006 for Jamie's life, with 12 years guaranteed; (3) pay the set-up and yearly custodial fees for management of the MSA account. Due to fluctuating interest rates, the amount that claimant will actually pay for the annuity at the time of settlement distribution may be different from this quote, but claimant does not expect it to differ significantly.

5. Attorneys Fees and Litigation Expenses

Since claimant and Jamie were residents of Florida until January of this year, and initially hired Florida counsel to represent them with respect to the instant claims, the contract for attorneys' fees has been entered into under Florida law. The fee arrangement

[2] For the sake of simplicity, claimant proposes to pay the cash seed amount of $66,012 and the custodial account set-up fee of $1,950 directly to Affiance Partners, LLC, and to purchase the MSA funding and yearly custodial fee annuities from New York Life for a premium payment of $392,537. See page 2 to Exhibit E.

is a contingent fee agreement incorporating the fee schedule of Rule 4-1.5(f)(4)(B)(i)b of the Rules Regulating the Florida Bar, which sets forth a sliding scale of 40% of the first $1 million of recovery, 30% of any portion of the recovery between $1 million and $2 million, and 20% of any portion of the recovery over $2 million. This calculation results in a fee in this case of $1,380,000, which is 26% of the total recovery. Claimant's attorneys have not charged any fees in addition to this contingent fee for the substantial amount of work they have devoted to the maintenance and cure issues in this case.

Claimant's attorneys also seek reimbursement for costs and expenses advanced to prosecute this litigation. The total advanced by all three of claimant's attorneys is $112,093.63.

6. Conclusion

Claimant submits that this settlement is in the best interest of Jamie and should be approved. She requests that this Court enter an order granting the relief requested in her motion, and such other relief as may be necessary to consummate the settlement.

Respectfully submitted,

KIMBERLY M. HANNA
By her Attorneys

John S. Foley #2060
Decof & Decof, P.C.
One Smith Hill
Providence, RI 02903
Telephone (401) 272-1110
Facsimile (401) 351-6641

John W. Merting
(Pro hac vice)
Law Offices of John W. Merting, P.A.
Suite 39 – Harbourtown
913 Gulf Breeze Parkway
Gulf Breeze, Florida 32561
Telephone (850) 916-9645
Facsimile (850) 916-9787

Andrew V. Buchsbaum
(Pro hac vice)
Friedman & James LLP
132 Nassau Street, Suite 900
New York, NY 10038
Telephone (212) 233-9385
Facsimile (212) 619-2340

## CERTIFICATION

I hereby certify that a true and accurate copy of the within document was sent by regular mail, postage prepaid, from Decof & Decof, P.C., One Smith Hill, Providence, RI 02903, to **Thomas Clinton, Esq. and Kenneth Chiarello, Esq.**, Clinton & Muzyka, P.C., One Washington Mall Suite 1400, Boston, MA 02108; **Michael R. Hagopian, Esq.**, 212 Greenwich Avenue, Warwick, RI 02886; **Dennis J. Roberts, II, Esq.** 40 Westminster Street, Suite 305, Providence, RI 02903; **Anthony DiGioia, Esq.**, Assistant U.S. Attorney, Fleet Center, 50 Kennedy Plaza, 8th Floor, Providence, RI 02903; **Clifford Pierce, Esq.**, Assistant Regional Counsel, U.S. Department of Health and Human Services, 2250 John F. Kennedy Federal Building, Government Center, Boston, MA 02203, and **William A. Poore, Esq.**, Poore & Rosenbaum, Commerce Center, 30 Exchange Terrace, Providence, RI 02901-1117 on the 18th day of October, 2005.

Avery P110

POORE & ROSENBAUM LLP
ATTORNEYS AT LAW

WILLIAM A. POORE
STEVEN ROSENBAUM*

NICHOLAS A. LAMBROS*
CHRISTOPHER J. O'CONNOR

*Also licensed in MA

Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02901-1117
Telephone (401) 831-2600
Fax (401) 831-2220

January 25, 2005
**Amended Correspondence*

John S. Foley, Esq.
Decof & Decof
One Smith Hill
Providence, RI 02903

John W. Merting, Esq.
913 Gulf Breeze Parkway, Ste. 39
Suite 39 – Harbourtown
Gulf Breeze, FL 32561

Andrew V. Buchsbaum, Esq.
132 Nassau Street, Ste. 900
New York, NY 10038

Thomas E. Clinton, Esq.
Clinton & Muzyka
One Washington Mall, Ste. 1400
Boston, MA 02108

Michael R. Hagopian, Esq.
212 Greenwich Avenue
Warwick, RI 02886

Dennis J. Roberts II, Esq.
40 Westminster St., Ste. 305
Providence, RI 02903

**Re: Kimberly M. Hanna v. RJF International Corp. and Clark Cooke, Inc.**

Counselors:

This correspondence confirms the successful resolution of the above-referenced matter by way of mediation conducted at my office on January 17, 2005 and January 18, 2005. As a result of the good faith efforts of all parties, the pending claims were settled pursuant to the following terms and conditions:

1. That all actions presently pending in both federal and state courts pertaining to any claims concerning the damages and injuries sustained to James Avery, including claims of consortium and any derivative claims, shall be dismissed, with prejudice, no interest, no costs. The parties shall execute any and all stipulations necessary to effectuate a complete dismissal of the pending actions;

2. That the defendant shall pay to the plaintiff the sum of $5,400,000.00;

3. That in addition thereto, the defendants shall satisfy presently pending and previously incurred medical bills at an amount not to exceed $67,600.00;

4. That the defendants shall stop paying for any and all costs associated with the medical care of James Avery as of Sunday, January 23, 2005. In addition thereto, they may pay the sum of $10,000.00 in order to subsidize Mr. Avery's transfer to another care facility. Said $10,000.00 shall be deducted from the amount of medical bills previously identified and said $10,000.00 shall be a direct credit to the defendants.

5. That it is the intention of the parties to structure the payment and funding in the settlement of this claim in a scheduled series of payments which will ensure for the best and most appropriate medical care for James Avery. The plaintiff shall have approximately two weeks to determine and assess the most appropriate vehicle for any such structured payments.

6. That the plaintiff shall provide a full release to the defendants and any of their nominees or agents.

7. That the plaintiff shall assume satisfaction of any Blue Cross liens and shall hold the defendants harmless therefrom.

8. That the parties shall seek approval of this settlement by the United States District Court by way and of a petition for approval and the appointment of a guardian ad litem.

I would like to take this opportunity to thank the parties for the cooperation extended throughout the mediation process, and for the appointment in this matter. I will, under separate cover, forward my invoice for legal services rendered. Thank you.

Very truly yours,

POORE & ROSENBAUM LLP

William A. Poore

WAP/hja
*Dictated but not read*

DRAFT

# THE JAMES M. AVERY IRREVOCABLE (d)(4)(A) TRUST

COPY

This declaration of trust is made this ___ day of September, 2005, by Kimberly M. Hanna, of Buzzards Bay, Massachusetts, to benefit my son, James M. Avery, as Donor, with Kimberly M. Hanna, as "trustee"and Chris A. Milne, of Dover, Massachusetts, as "trustee" and from time to time as "independent trustee", hereinafter referred to as the "trustee".

## 1. THE TRUST FUND

1.1. Initial Funding.

The donor shall initially fund this trust with the assets of James M. Avery, which assets are described in Schedule "A" attached hereto. By execution hereof, on behalf of James M. Avery, I hereby assign, convey, transfer, and deliver the described assets to the trustee on the date hereof.

1.2. Additional funding.

The trustee may accept property from any source and upon any terms, but no property may be added, if the trustee believes it will not be in the best interest of James M. Avery.

1.3. Irrevocability.

The donor hereby relinquishes all power to alter, amend, or revoke any provisions of this trust agreement. This trust agreement shall be irrevocable. The trustee, however, may at any time, or from time to time, amend any administrative provisions of this trust by any instrument in writing signed and acknowledged by the trustee. For purposes of the foregoing, the term "administrative provision" refers to any provision of the trust dealing with the management and administration of the trust and in no event shall any such amendment affect, enlarge or shift any beneficial interests created hereunder. In addition, the trustee may at any time, or from time to

time, amend provisions of the trust to preserve the eligibility of James M. Avery for any public benefits or to enable James M. Avery to achieve eligibility for public benefits. In no event shall any such amendment affect, enlarge or shift any beneficial interests created hereunder unless specifically required by a public agency. In no event shall any such amendment change the obligations of the independent trustee without their consent. At least ten days prior to any such amendment being made to the trust, the trustee shall give written notice of the anticipated amendment by mailing a copy by first class mail to the legal department of the Massachusetts Division of Medical Assistance, or it successor.

1.4. Beneficiary.

This is a nonsupport, supplemental needs trust for the benefit of my son, James M. Avery, who may hereinafter be known as "James" hereunder. James was born on October 26, 1982, and is disabled as defined in section 1614(a)(3) of the Social Security Act, such disability evidenced by the Social Security Administration Notice of Change in Benefits attached hereto as Schedule B. I intend to create a trust that will qualify for the Medicaid exclusion under 42 U.S.C. §1396p(d)(4)(A). James is my son. In addition, I have been appointed James' guardian by the Okaloosa County, Probate Court in Florida.

1.5. Name of trust.

This trust may be designated The James M. Avery Irrevocable (d)(4)(A) Trust.

## 2. THE TRUST PURPOSE

2.1. Supplemental nature of trust.

The purpose of this trust is to supplement, but not to supplant, whatever benefits and services James may from time to time be eligible to receive by reason of age, disability, or other factors, from federal, state, and local governmental and charitable sources. I have entered into this trust on behalf of James with the recognition that governmental and charitable programs, in themselves, contain many gaps that, if unaddressed, will greatly reduce the possibility of James maintaining himself as independently as possible and having the capacity to meet his future needs for residential, personal, and other nonmedical services. It is, therefore, my intent and direction that the trustee use the principal and income of the trust to provide James with those benefits and services, and only those benefits and services, that, in the trustee's judgment, are not otherwise available to James from other sources as or when needed for his welfare. Without limiting the discretion of the trustee to take whatever actions it may consider necessary for James' welfare, in accordance with the trust purposes, I desire that the trust be used in ways that will best enable James to lead as normal, comfortable, and fulfilling a life as possible.

2.2. Authority to initiate proceedings for public benefits eligibility.

In determining whether the existence of this trust has the effect of rendering James ineligible for any program of public benefit, the trustee is hereby granted full and complete discretion to initiate action to render James eligible for any such program or public benefit, and is hereby granted full and complete discretion to initiate either administrative or judicial proceedings, or both, for the purpose of determining eligibility. All costs relating thereto,

including reasonable attorney fees, shall be charged to the trust. The trustee is directed to defend, at the expense of the trust, all contests or attacks of any nature against the trust.

2.3 Quality of Life.

It is my intention that the trust be used to maintain James in the most home-like, independent environment possible, to allow James to communicate to the greatest extent possible and to maximize his potential socially, emotionally and academically. By way of examples, and without limiting the trustee's discretion, the trustee may use trust principal and income to pay for any technology which will assist James in communicating and to purchase a residence for James and to make any necessary improvements or renovations to any homes where James is residing. Further, by way of example, the trustee shall use the trust to promote interaction between James and his family.

2.4. Level of Care.

In providing for James' care, the trustee, in consultation with the care committee as described in Section 3, shall spend as much of the net income and principal of the trust as it, in its sole and absolute discretion, shall deem necessary and reasonable under the circumstances then prevailing to enable James to receive care and medical treatment in the most home-like environment possible. In addition, as needed, the trustee will spend as much of the net income and principal as necessary to provide the maximum level of medical, nursing, rehabilitative, or comfort care for James, including:

(a) If James is hospitalized, the trustee shall have the discretion to seek a level of care for James beyond that which would ordinarily be provided in a hospital setting, including, if and when appropriate, in the sole and absolute discretion of the trustee, arranging for James to be

placed in a private room, or if available, in the more luxurious type of accommodations now offered by some hospitals, and by hiring registered or practical nurses, or other caregivers, as appropriate, on a part-time, full-time or 24-hour basis to supplement the regular level of hospital care.

(b) If James' medical condition is such that nursing care or medical equipment is required for his care, the trustee shall undertake all reasonable efforts to provide such care for him at his home, including the hiring of part-time, full-time or 24-hour nurses or other caregivers, the renting or purchasing of any medical equipment necessary for his care, and accommodating, by architectural changes if necessary, any physical needs James may have.

(c) The trustee is authorized to spend trust income and principal to provide personal aides, homemakers, bill payers, or other persons who may assist James in his daily living and otherwise enable him to reside in his home for as long as it is feasible to do so, taking into account James' safety.

(d) If James' condition is such that the care committee determines that his best interests will be served by James receiving care at a residential care facility, the trustee shall make every effort to select the facility which offers the highest quality of care and the most comfortable surroundings reasonably available, and shall personally monitor, or shall hire, at the expense of the trust, a care manager or other such qualified person who shall monitor, or supervise the monitoring of James' care, not less often than weekly. If the care committee, determines that James' comfort and well-being would be enhanced by the hiring of additional nursing personnel, or of a companion or other caregiver, the trustee shall have discretion to hire and shall actively direct such personnel in caring for James. The trustee may hire family members in this regard.

Family members shall be entitled to compensation equal to the customary and prevailing charges for services of a similar nature during the same period and in the same geographic locale.

(e) If James should ever require the services of an organization such as hospice, and if such organization cannot provide 24-hour, seven-day per week home care, then the trustee shall spend trust assets to hire supplemental nurses, nurses aides or other caregivers to work with the hospice professionals and provide services in their absence.

## 3. CARE COMMITTEE

(a) The care committee shall advise the trustee on the use of the trust funds for James' care and well being and to ensure that the trustee utilizes the trust funds in a manner consistent with the trust purpose as described above in Section 2. At present, the care committee is myself, Kimberly M. Hanna. If for any reason I am no longer able to serve on the care committee, I appoint, my cousin, Robert W. Munroe, of Shrewsbury, Massachusetts and my daughter, Stacy Avery Hanna, of Mary Esther, Florida, to serve on the care committee. If I am not able to serve on the care committee, the committee shall always include at least two members, one of whom must be a licensed social worker with expertise and experience in working with disabled individuals and advocating on their behalf to obtain appropriate services and benefits. The social worker shall be chosen by the then serving members of the care committee.

(b) The care committee shall terminate upon James' death.

## 4. DURING JAMES' LIFE

4.1. <u>Payments of Income and Principal for James</u>

The trustee may make payments of income and principal to or on behalf of James, the making and the amount of any payment from the trust being totally and solely within the discretion of the trustee. The trustee's discretion, to make trust distributions is contingent upon the approval of the independent trustee as described in paragraph 6.3 below. Whenever the trustee has discretion to pay income or principal to a beneficiary, the trustee may make the payments at any time, in any amounts and proportions, and for any purposes as the trustee considers advisable. The trustee may take into account any factors it considers appropriate, having regard for the purposes of the trust described above in Section 2. Neither James nor any person acting on his behalf as guardian, conservator, guardian ad litem, attorney, or agent, shall have any right, power, or authority to liquidate the trust, in whole or in part, or to require payments from the trust for any purpose. This restriction does not bar any person acting in any such capacity from also serving as trustee hereunder and exercising all rights and powers of a trustee under this instrument. The trustee is directed to conserve and accumulate the trust estate to the extent feasible, due to the unforeseeability of James' future needs. However, accumulation or use of the trust is to be determined solely on the basis of the needs of James, without regard to the interests of the remaindermen.

## 5. AFTER JAMES' DEATH

5.1. Distribution upon death of James.

This trust shall terminate upon the death of James, at which time the trustee shall:

(a) Pay the trust property and undistributed income to the Commonwealth of Massachusetts and to any other state which has paid for James' care under the Medicaid program up to an amount equal to the total amount of medical assistance paid on behalf of James under the Medicaid program, to the extent such medical assistance has not already been reimbursed from any other source. Such payment or payments from the trust shall be apportioned among the Commonwealth of Massachusetts and other states in proportion to each state's share of the total medical assistance paid on behalf of James;

(b) Pay the remaining trust property and undistributed income as James may appoint by will as provided in paragraph 7.4 to any person or not-for-profit association; and

(c) Pay any remaining principal and undistributed income not so appointed, in equal shares to me, Kimberly M. Hanna, and Stacy Avery Hanna. If either of us does not survive James, the trustee shall pay that person's share to her issue by right of representation. If that person does not have then living issue, the trustee shall pay that person's share to the survivor of myself and Stacy.

5.2. Distribution if no beneficiary living.

If at any time no person is living who is eligible to receive property under the foregoing provisions of this trust, the trustee shall pay the remaining property to the persons who would be entitled to receive the property under the laws of Massachusetts then in force and in the

proportions prescribed by such laws as if James had then died intestate, a resident of Massachusetts, and not survived by a father.

5.3. Payments to persons under thirty or unable to manage their affairs.

If a person becomes entitled to any income or principal before reaching the age of thirty years, or while, in the trustee's opinion, a beneficiary is unable to manage his or her affairs because of physical condition or mental incapacity, whether or not he or she has any legal guardian or conservator: (a) the trustee may pay all or any part of the property to the person or use or distribute it for his or her benefit without liability to see to the application of the payment; and (b) if the trustee elects to set apart a separate trust, the trustee may accumulate or retain all or any part of the property or income therefrom in trust and later may pay it as provided in clause (a). When the person under the age of thirty years reaches that age, or when the trustee considers the incapacitated person to be able to manage his or her affairs, the trustee shall pay the remaining principal and undistributed income held for such person to the person. If a person for whom property is held in trust under clause (b) dies, the trustee shall pay the remaining trust property to the person's issue then living, per stirpes, or, if none, to the issue then living per stirpes of the person's parent, or if none, to the person's estate. This paragraph 5.3 shall not apply to James' interest in the trust during his life.

## 6. THE TRUSTEE

6.1. Appointment of trustee.

(a) At present, the trustees are myself and Chris A. Milne. If I am not living and legally competent, I appoint, Robert W. Munroe, as successor trustee to serve along with the independent trustee. If he is not living and legally competent, I appoint, Stacy Avery Hanna, to

serve along with the independent trustee as successor trustee. The term "trustee" includes the original trustees and all successor or additional trustees.

(b) I may appoint successor and additional trustees, including the independent trustee and successor and additional member of the care committee. If I am not living and legally competent, successor and additional trustees, including the independent trustee and successor and additional members of the care committee may be appointed by Robert W. Munroe; otherwise, successor trustees and additional trustees including the independent trustee and successor and additional members of the care committee may be appointed as follows:

(i) by the remaining trustee or trustees, or, if none, by the resigning trustee; or,

(ii) if there is no remaining or resigning trustee, by a probate court of the Commonwealth of Massachusetts.

(c) James may not serve as trustee.

(d) A successor trustee need not be appointed if the independent trustee continues to serve.

(e) The appointment of any trustee shall be effective upon acceptance.

6.2. Removal or resignation of trustee.

(a) I may remove any trustee, including the independent trustee and members of the care committee, by written notice. However, I can only remove the independent trustee upon my obtaining the approval of a probate court of competent jurisdiction. The independent trustee shall continue to serve until there is a successor independent trustee serving. If I am not living and legally competent, Robert W. Monroe shall have the same power to remove a trustee, including the independent trustee. If he is not living and legally competent, Stacy Avery Hanna shall have the same power to remove a trustee, including the independent trustee. If she is not living and legally competent, a guardian, conservator or attorney-in-fact for James shall have the same power to remove a trustee, including the independent trustee. If James is deemed by a court to be legally competent, James shall have the power to remove a trustee, including the independent trustee. No person shall possess or participate in this removal power if the power would be a general power of appointment with respect to that person for federal gift tax or estate tax purposes.

(b) A trustee, including the independent trustee, and members of the care committee may resign by giving thirty days' written notice to me, or, if I am not living and legally competent, to Robert W. Monroe, and if he is not living and legally competent to Stacy Avery Hanna, or, if there are no persons so qualified, to the remaining or succeeding trustee, provided that the resignation of a sole remaining trustee shall become effective only upon the appointment and

acceptance of a successor trustee. However, the resignation of the independent trustee shall only be effective upon the appointment and acceptance of a successor independent trustee. If the independent trustee resigns, a successor independent trustee may be appointed without myself, Robert W. Monroe or Stacy Avery Hanna, having to obtain court approval. In default of such appointment, the independent trustee may petition a probate court of competent jurisdiction to appoint their successor, sixty (60) days subsequent to their delivering their initial written notice of resignation. Costs associated with filing such a petition shall be paid by the trust.

(c) A trustee and members of the care committee shall cease to serve in the event of his or her incapacity. A trustee's incapacity shall be established by (i) a certificate signed by two licensed physicians and delivered to the trustee being removed and the remaining trustees or, if no trustee is then remaining, to the succeeding trustee, stating that the trustee is not capable of managing the financial affairs of the trust or (ii) the appointment of a guardian or conservator for the trustee.

6.3. Independent trustee.

At all times there shall be an independent trustee serving. At present, the independent trustee is Chris A. Milne. The independent trustee must approve any trust distributions exceeding $500 and any trust distributions exceeding annual cumulative distributions of $5,000. The independent trustee will review trust financial statements on a monthly basis to verify that the trust assets are being used in a manner consistent with the trust purpose as described in Section 2. An independent trustee is an individual or an institution, who is a bank or trust company, a professional trustee, investment banker, accountant or lawyer and who has no beneficial interest in the trust, and who is not related or subordinate to James, his parents, or his spouse, if any, or any of his children as defined in section 672(c) of the Internal Revenue Code of 1986, as amended.

6.4. Investment Decisions.

The trustee shall retain the services of one or more professional investment advisors to advise the trustee regarding investment decisions. The professional investment advisor shall be a Series 7 registered representative who is regularly engaged in the business of managing assets for others and who is employed by a financial institution with at least Five Hundred Million ($500,000,000.00) Dollars under active management. The trustee may at any time discharge the investment advisor. However, the financial advisor must be replaced with another financial institution which meets the requirements of this paragraph.

6.5. Additional trustee provisions.

(a) Each appointment, removal, resignation, acceptance, or notice under this section 6 shall be in writing and, without affecting the validity of any action, copies shall be given to all the trustees. Any notice may be waived by the person to whom it is to be given.

(b) Each successor or additional trustee, including the independent trustee, whether or not named by me, shall have all the rights and powers of his or her predecessor, except as limited by this agreement or by law. The same title to the trust fund of a predecessor trustee shall vest in each successor or additional trustee by virtue of the trustee's appointment and acceptance without any further instrument of transfer or conveyance.

(c) Subject to paragraph 6.2, when there is a trustee vacancy, the remaining trustee or trustees shall act alone until the vacancy has been filled, unless disqualified from acting by this agreement or by law. During the absence or disability of any trustee, the remaining trustee or trustees, except where disqualified, may act alone subject to any limitations imposed in writing by the absent or disabled trustee.

(d) Anyone dealing with the trust property may rely on a writing signed by any trustee as to the trustee's authority to act on behalf of the trust.

6.6. General powers of trustee.

In addition to all common law and statutory authority, including but not limited to the Statutory Optional Fiduciary Powers provided in M.G.L. Ch. 184B, the trustee, including the independent trustee, except as otherwise provided, shall have power without approval of any court and in any manner it considers advisable:

(a) to retain any property in the form in which it is received from James, his estate, or any other source and to purchase or retain any residence for James;

(b) to repair, insure or otherwise care for any property and to pay any shipping or other expenses relating to the property as the trustee deems advisable;

(c) to abandon any property the trustee considers worthless;

(d) to make any improvements to any real or personal property;

(e) to invest income and principal without being subject to legal limitations on investments by fiduciaries and, without limiting the generality of the foregoing, to invest in investment company shares or in shares or undivided portions of any common trust fund;

(f) to buy, sell, convey, mortgage, exchange, assign, lease, including executing and delivering leases as landlord or tenant or otherwise dispose of or encumber including granting easements or acquiring rights or easements any real or personal property on any terms, no purchaser being bound to see to the application of any proceeds, and whether or not the effect thereof extends beyond the term of this trust;

(g) to keep securities or other property in the name of a nominee;

(h) to pay, compromise or contest claims or controversies involving the trust, including claims for taxes;

(i) to determine in accordance with reasonable accounting principals and practice and state law, what part of the trust property is income and what part is principal;

(j) to exercise all the rights that may be exercised by any security holder in an individual capacity and to delegate any such rights;

(k) to borrow any amounts with or without security;

(l) to allot in or towards satisfaction of any payment, distribution or division, pro rata or non-pro rata, any trust property in James' estate at the then current fair market value determined by the trustee;

(m) to hold trusts and shares undivided or at any time to hold the same or any of them separate; and

(n) to retain any investment counsel and advisors, accountants, depositories, custodians, brokers, attorneys and agents and to pay them the usual compensation for their services, to accept and act upon the recommendations of investment counsel and advisors, and to delegate to any investment counsel and advisors, custodians, brokers or agents retained by the trustee any ministerial or discretionary powers;

(o) to make distributions in cash or kind.

6.7. Bonds and accounts.

(a) No trustee shall be required to give bond, or, if a bond is required by law, no sureties on the bond shall be required.

(b) The independent trustee shall provide me with a monthly financial statement regarding all trust assets which includes: monthly beginning balance; monthly ending balance; a listing of all checks drawn on the account including payee and amount; deposits; and income earned. If I am not living and legally competent, the independent trustee shall continue to provide statements to Robert W. Monroe, and if he is not living and legally competent, to Stacy Avery Hanna and if she is not living and legally competent, a guardian, conservator or attorney-in-fact for James. If James is deemed to be legally competent, the independent trustee shall also provide him with a copy of the monthly financial statements. The monthly financial statement shall serve as a written trust account for that month.

(c) Upon my written request, the independent trustee shall prepare a written annual account statement which will include all of the income and the distributions for all assets for that

year. If I am not living and legally competent, Robert W. Munroe may request an annual account statement and if he is not living, Stacy Avery Hanna may request an annual account statement. If James is deemed to be legally competent he may also request an annual account statement. The account shall reflect the expenses and income for all assets held by the independent trustee of the trust for that year. Subsequent to James' death, the independent trustee shall provide copies of the trust account statements reflecting the performance of trust investments to the trust beneficiaries.

(d) Any account of the trustee assented to in writing by myself or if I am not living and legally competent, by Robert W. Munroe and if he is not living and legally competent, by Stacy Avery Hanna or after James' death, by trust beneficiaries, shall be conclusive, except for fraud or manifest error, on all parties in interest, whether or not of full age or in being or ascertained. Nothing in this paragraph shall be construed to give anyone the power or right to enlarge or shift the beneficial interest of any beneficiary. If a person whose assent would be required if legally competent is under guardianship or conservatorship, the guardian or conservator may act in behalf of the person and the guardian's or conservator's assent shall be required. The failure of any person to object to any account or financial statement by a writing mailed to the independent trustee within ninety days after the mailing of a copy of the account to that person shall be conclusively deemed an assent by that person except for fraud or manifest error. The independent trustee may present any trust accounts for allowance to a court of competent jurisdiction, and no guardian ad litem shall be appointed in that proceeding.

6.8. Delegation among trustees.

Any trustee may delegate to any other trustee acting under this instrument, if any, the power to exercise any or all powers granted the trustee in this agreement, including those that are discretionary except as specifically delegated to the independent trustee and the independent trustee. The trustee may revoke any such delegation at will. The delegation of any such power, as well as the revocation of any such delegation, shall be evidenced by an instrument in writing executed by the delegating trustee. So long as any delegation is in effect, any of the delegated powers may be exercised by the trustee receiving such delegation with the same force and effect as if the delegating trustee had personally joined in the exercise of such power.

Trustees may only delegate additional powers and duties to the independent trustee with the written approval of the independent trustee.

6.9. Fees for the trustee and care committee.

The trustee, including the independent trustee and care committee shall be entitled to fair and reasonable compensation for the services the trustee renders a beneficiary or the trust. The amount of compensation shall be an amount equal to the customary and prevailing charges for services of a similar nature during the same period of time and in the same geographic locale. The trustee shall be reimbursed for the reasonable costs and expenses incurred in connection with

the trustee's fiduciary duties performed under this agreement.

6.10. Majority required for control.

The concurrence and joinder of a majority of the trustees, if more than one trustee is acting, shall control in all matters pertaining to the administration of the trust created under this agreement, except as specifically delegated to the independent trustee. If only two trustees are acting, the concurrence and joinder of both shall be required. When more than two trustees are acting, any dissenting or abstaining trustee may be absolved from personal liability by registering a dissent or abstention with the records of the trust; the dissenting trustee shall thereafter act with the other trustees in any manner necessary or appropriate to effectuate the decision of the majority.

6.11. Adequate consideration.

Notwithstanding the provisions of paragraph 6.6, none of the powers accorded to the trustee shall be construed to enable the trustee or any other person to purchase, exchange, or otherwise deal with or dispose of the principal or income of this trust for less than adequate or full consideration in money or money's worth, or to enable the grantor or the trustee to borrow the principal of this trust, directly or indirectly, without adequate interest or security.

6.12. Real property and environmental matters.

The trustee, including the independent trustee shall have the following rights and powers with regard to real property, operating businesses, and environmental matters:

(a) The right to inspect all real property and business trust assets and to require the trust to pay reasonable costs of determining the existence and nature of any real or potential hazardous wastes on or in such real property prior to accepting the role and responsibility of trustee hereunder.

(b) As trustee, the right and power to inspect all real property trust assets and to take all and any reasonable steps, at trust expense, to prevent, stop, or abate any actions or conditions that constitute or may constitute violations of any environmental legislation or regulation.

The trustee shall also be held harmless and indemnified with regard to any claims that may arise with regard to real property or business trust assets, regardless of when allegedly violative actions were taken with regard to such real property and regardless of by whom such actions were taken. The trustee shall similarly be held harmless and indemnified for any liability or costs or expenses that may arise from hazardous waste and other environmental legislation or

litigation. It is the grantor's intent and direction that the trustee suffer no personal financial exposure or risk on account of such environmental issues while serving as trustee.

6.13. Trustee liability.

No trustee, including the independent trustee, or any member of the care committee shall be held personally liable by reason of any action taken, suffered or omitted in good faith. Each additional or successor trustee, including the independent trustee, and members of the care committee shall not be liable for any acts or omissions of any individual or institution prior to the time he or she was appointed.

## 7. BENEFICIARIES' INTEREST AND POWERS

7.1. Interests of beneficiaries not to be alienated.

The interest of any beneficiary under this agreement shall not be subject to assignment, alienation, pledge, attachment, or claims of creditors.

7.2. Disclaimers.

In addition to any power to disclaim conferred by law, any beneficiary (including the executor or administrator of a beneficiary's estate) may disclaim in whole or in part any power or interest granted to the beneficiary under this agreement. If a beneficiary disclaims any interest before having received any benefits of the interest, then the property subject to the interest shall pass as if the beneficiary had died before becoming entitled to it. If a beneficiary releases any interest after having received any benefits of the interest, then the property subject to the interest shall pass as if the beneficiary had then died.

7.3. Payments for beneficiaries.

(a) Income payable to a person and income or principal that in the discretion of the trustee may be paid to a person may be used by the trustee for the person's benefit whether or not that person is legally competent or under conservatorship or guardianship.

(b) Payments of any amount to be made to a minor may be made to a custodian for the minor under the Uniform Transfers to Minors Act or any similar statute or such payments may be made to either of his or her parents or to any person having custody of the minor.

(c) If property becomes payable to the estate of any person and the trustee believes there is no duly appointed fiduciary and that none is contemplated, the trustee may, upon being furnished suitable indemnity, make payment to the persons who the trustee believes are entitled to the payment, without liability to see to the application of the payment.

7.4. Power of Appointment.

Any power of appointment by will granted under this agreement can be exercised only by will by specific reference to this agreement and the power to be exercised and shall include the right to appoint all or part of the property subject to the power, to appoint outright, to give to the appointee or appointees different types of interests and general or limited powers of appointment, to appoint in trust and create separate trusts, to appoint a new trustee or trustees, and to give a trustee or trustees discretion to pay or apply income and principal within the class of permissible appointees.

## 8. DEFINITIONS AND CONSTRUCTION

8.1. Income.

Income means net income and accumulated income not added to principal. Income received during the period of administration of James' estate shall be treated as income by the trustee if it would have been so treated had it been received directly by the trustee. Undistributed income at the termination of the income interest to which it relates shall be dealt with as if accrued and received thereafter.

8.2. Distributions per stirpes.

Where distribution of income or principal is to be made to a person's issue per stirpes, the person's children, whether or not living at the time of the distribution, shall be treated as the original stocks, and a further subdivision shall be made at each succeeding generation.

8.3. Adopted children.

The words "child" and "issue" and the like include persons adopted in their minority and persons tracing descent through one or more such adopted persons in all respects as if descended by blood and include persons descended by blood, unless adopted while under the age of one year old by someone other than a step-parent, grandparent, aunt or uncle, or guardian named by the adopted person's natural parent.

8.4. Survival.

Where it is required by this agreement that any person shall have survived another, that requirement means that the person shall have survived the other person by at least thirty days.

8.5. Rule against perpetuities.

Regardless of any other provisions contained in this agreement, all trusts under this agreement shall terminate no later than twenty-one years after the death of James.

8.6. Governing law and construction.

This agreement shall be construed, governed, and administered in accordance with Massachusetts law. The headings of the paragraphs of this agreement are inserted for convenience only and shall not affect its construction. In the construction of this agreement the gender of pronouns and the singular or plural form of words shall be disregarded where appropriate. References to provisions of the Internal Revenue Code shall be deemed to include any corresponding provisions of subsequent federal tax laws.

8.7. Tax liability.

It is the intent of the grantor that this trust be construed as a "grantor trust" under Internal Revenue Code Section 677(a) and that for tax purposes James be considered the grantor. All income distributed, held, or accumulated by this trust shall be taxable to the grantor. The trustee may distribute to the grantor such amounts of income or principal of the trust as the trustee deems necessary to satisfy the grantor's tax obligation, to the extent that the income of the trust generates a tax liability for the grantor.

8.8. Effective date.

This instrument shall take effect when signed by me and any trustee.

Executed under seal this _____ day of September, 2005.

DRAFT

_______________________________
Kimberly M. Hanna, Donor and Trustee

_______________________________
Chris A. Milne, Independent Trustee

COMMONWEALTH OF MASSACHUSETTS

_____________, ss.

On this _____ day of September, 2005, before me personally appeared Kimberly M. Hanna, Donor and Trustee, to me known to be the person described in and who executed the foregoing trust, and acknowledged that she executed the same as her free act and deed.

_________________________________

Notary Public
My commission expires:

K:\Avery\(d)(4)(A) trust-7-18-05-draft.wpd

**SCHEDULE A**

**SCHEDULE B**

COPY

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

OFFICE OF THE
GENERAL COUNSEL

CHIEF COUNSEL-REG.1
2250 JFK FED. BLDG.
BOSTON, MA 02203
TEL. (617) 565-2370
FAX (617) 565-4809

March 24, 2005

John S. Foley, Esq.
Decof & Decof
One Smith Hill
Providence, R.I. 02903

Re: Petition of R.J.F. International Corp., C.A. No. 01-588-S (D. R.I.)

Dear Mr. Foley:

As we discussed, the Centers for Medicare and Medicaid Services ("CMS") has reviewed the terms and conditions of the settlement agreement negotiated by the parties in the above action. It is CMS' position that the Medicare secondary payer statute, 42 U.S.C. § 1395y(b), will preclude the Medicare program from paying for any medical services that Mr. Avery may require in the future which are related to the injuries claimed or released in the settlement, until such time as his expenses for such services equal either the amount of the settlement or, if a set-aside arrangement is approved by CMS, the amount set aside. Please let me know if you would like to discuss the terms of a set-aside arrangement, or if you have any additional questions.

Sincerely,

Clifford Pierce
Assistant Regional Counsel

cc:

Thomas E. Clinton, Esq.
Clinton & Muzyka, P.C.
One Washington Mall, Suite 1400
Boston, MA 02108

DEPARTMENT OF HEALTH & H. .IAN SERVICES
Centers for Medicare & Medicaid Services
JFK Federal Building, Government Center
Room 2375
Boston, Massachusetts 02203
(617) 565-1233

CMS
CENTERS for MEDICARE & MEDICAID SERVICES

**Division of Medicare Financial Management / Region I**

September 6, 2005

John S. Foley
Decof & Decof
One Smith Hill
Providence, RI 02903

RE: Third Party Liability Medicare Set-aside Arrangement
Claimant: James Avery
HICN: [redacted]
Date of Injury: August 11, 2001

Dear Mr. Foley:

This letter is in response to your initial proposal for a third party liability Medicare Set-aside Arrangement (MSA) on behalf of the above named individual.

You proposed that a MSA be funded with an initial deposit of $68,700.00 followed by annual payments of $29,798.89 to be made for James Avery's lifetime for the purpose of paying future medical services related to the injury or disease resulting from the incident that occurred on August 11, 2001 that would otherwise be reimbursable by Medicare.

We have evaluated your proposal to protect Medicare's interests with a MSA for future medical expenses related to James Avery's work injury or disease and have determined that the agreed upon structured arrangement referenced below adequately considers Medicare's interests. The MSA funds must be placed in an interest bearing account. Funds must be available for payment of services that would otherwise be covered by Medicare per the following payment schedule.

Initial deposit of $66,012.00 upon settlement to be followed by annual payments of $33,006.00 for the remainder of James Avery's lifetime.

When a MSA is funded as a structured settlement (settlement monies apportioned over fixed or defined periods of time), any MSA funds that are not used in a given year must remain in the account in subsequent years for payment of services that would otherwise be reimbursable by Medicare. When all MSA funds (including the current year's full structured payment plus any prior year's remaining funds plus interest) have been depleted in a year, Medicare will pay for services that are related to the work injury or disease for the remainder of that year until the scheduled date for the subsequent year's deposit into the MSA account. Bills should be paid in chronological order to enable CMS' Medicare Contractor to identify when the funds become temporarily exhausted.

Approval of this MSA is not effective until a copy of the final executed settlement agreement, which must include this approved MSA amount, is received by CMS at the following address:

Centers for Medicare & Medicaid Services
Thomas Hatchfield, Division of Medicare Financial Management
2375 J.F.K. Federal Building
Boston, MA 02203

The proposed settlement agreement provides for future medical expenses to be paid based on provider, physician, and supplier full actual charge amounts. Therefore, the MSA is approved to pay full actual charge amounts for future medical expenses that would otherwise be reimbursable by Medicare.

Once the funds in the MSA account have been exhausted and Medicare has been provided with information to document that payments from the account were appropriate, Medicare will begin paying for the beneficiary's Medicare-covered services. The beneficiary's Medicare-covered expenses will be reimbursed by Medicare unless another entity under 42 U.S.C. Section 1395y(b) is responsible for primary payment of such expenses.

Funds in a Medicare set-aside arrangement may not be used to purchase a Medicare supplemental insurance policy or a Medigap policy for a beneficiary, or to pay for the premiums for such policies.

You have indicated that Affiance Partners will act as administrator of the MSA funds. Annual accounting summaries related to the expenditures of the arrangement must be sent to CMS' Medicare contractor listed below no later than 30 days after the end of each year (beginning with one year from establishment of the MSA account). Annual accountings should continue through depletion of the account. Please see the enclosed instructions titled, Professional Administration of a Medicare Set-aside Arrangement (MSA).

Associated Hospital Services
Medicare Secondary Payer Unit
110 Free Street
Portland, ME 04101-3908
Attention: MSP – Medicare Set Aside Reconciliation

Please note that the decision regarding future medical treatment is independent of any injury-related medical claims that Medicare may have already paid. Any Medicare payments made prior to the date of settlement for injury-related medical services must be repaid to Medicare. Should any such claims be identified in the future, you will be notified by the lead CMS Medicare contractor in this case, and reimbursement to Medicare will be required by the entity responsible for payment during the corresponding time period.

If you have any questions concerning this letter, please call Thomas Hatchfield at 617.565.1254.

Sincerely,

James L. Bryant
Associate Regional Administrator

Enclosure

CC: Kimberly Hanna for James M. Avery
Affiance Partners
Wendy Fusco, Associated Hospital Service

When the approved MSA funds are depleted and a satisfactory accounting has been provided to the Centers for Medicare & Medicaid Services (CMS), Medicare will pay for any Medicare-covered medical treatment. However, failure to adhere to any of the following requirements will be regarded as a failure to reasonably recognize Medicare's interests and Medicare will deny coverage for all accident-related medical treatments. The requirements are as follows:

1. <u>Medicare Set-Aside Account</u> - The MSA funds shall be placed in an interest bearing account, which is separate from any personal checking or savings account. A copy of the documents establishing the MSA account shall be sent to CMS at the following address within 30 days of disbursal of the settlement award.

   Centers for Medicare & Medicaid Services
   Thomas Hatchfield, Division of Medicare Financial Management
   2375 J.F.K. Federal Building
   Boston, MA 02203

2. <u>Distribution of funds from the Medicare Set-aside Account</u> - The funds in the MSA account shall be used solely for expenses related to medically necessary services or supplies incurred for those medical needs related to or resulting from the accident-related injury, which would otherwise be reimbursable or paid for by Medicare. Funds in the MSA account shall not be used to pay for medical services not covered by Medicare. Examples of services and items not covered by Medicare include (but are not limited to) travel expenses for medical appointments, acupuncture, routine dental care, eyeglasses, and hearing aids. Medicare covered services are available in the booklet "Medicare & You" which can be obtained from any local Social Security office. If there are any questions concerning what Medicare covers, please visit the Medicare websites at **www.medicare.gov** or **www.cms.hhs.gov** or call 1-800-Medicare (1-800-633-4227).

3. <u>Set-Aside Account Interest</u> - All interest earned on the Medicare Set-Aside account will be allowed to accrue in the account and will be used solely for medical expenses that would otherwise be covered by Medicare and for banking fees, mailing fees, or document-copying charges related to the account.

4. <u>Reimbursement to Medicare</u> - In the event CMS determines that Medicare has erroneously paid benefits, CMS (or its designated Contractor) shall have the right to seek and receive reimbursement of any such conditional payments or overpayments.

5. <u>Accounting Records</u> – The administrator shall maintain accurate records of the distributions and expenditures from the MSA account. The records should indicate:

   - the date of service;
   - the name of the medical provider or supplier;
   - the medical diagnosis, procedure, service, or item received;
   - the amount paid;
   - and the date of the payment.

   The administrator shall also retain a receipt or other evidence of each and every payment made from the MSA account.

6. Annual & Final Accountings – The administrator shall submit an annual accounting of the MSA account to CMS. The annual accounting shall be submitted no later than 30 days after the close of the annual accounting period (which is the anniversary of the funding of the MSA from the settlement). The administrator shall submit a final accounting within 60 days of the funds being depleted. The annual and final accountings will include the information set forth in paragraph five above.

7. Delivery of Notices & Accountings - All required accountings and notices shall be sent to CMS' Medicare contractor at the following mailing address:

Associated Hospital Services
Medicare Secondary Payer
110 Free Street
Portland, ME 04101-3908
Attention: MSP – Medicare Set-aside Reconciliation

8. Distributions Following Death of Beneficiary - In the event that the Medicare beneficiary dies before the funds in the MSA account are depleted, the account will continue to exist for payment of any outstanding bills for work-related injury medical expenses that would otherwise be covered by Medicare. Any funds remaining in the MSA account after payment of all outstanding bills for work-related medical expenses shall be paid to the beneficiary's estate or subject to State Law.

9. Inappropriate Set-aside Account Expenditures - If, after the MSA account is depleted, the final accounting reveals that funds in the account were used to pay for items other than Medicare allowable expenses related to necessary services or supplies resulting from the accident-related injury, Medicare will not pay for any future accident-related medical expenses until the funds have been restored to the account and properly exhausted.

*The* Settlement Services *Group*

*Protection through planning*

# CONFIDENTIAL STRUCTURED SETTLEMENT PROPOSAL FOR JAMES AVERY

**Claimant's D.O.B:** [redacted]
**Funding Date:** 11/01/2005 (Rate valid until 09/29/2005 - after call to confirm)
**Life Insurance Co:** New York Life (A++)

| | **Final Cost** | | **Certain Payout** | **Normal * Life Expected Payout** | **Cost** |
|---|---|---|---|---|---|
| **I.** | **MSA ALLOCATION CASH SEED** | | $66,012 | $66,012 | $66,012 |
| **II.** | **MSA CUSTODIAL SET UP FEE** | | $1,950 | $1,950 | $1,950 |
| **III.** | **STRUCTURED SETTLEMENT BENEFITS** | | | | |
| | **A. Lifetime Annual Benefit - MSA** | | | | |
| | $33,006.00 | per year beginning Nov-1-2006 for life with 12 years certain | $396,072 | $1,848,336 | $381,705 |
| | **B. Custodial Fee** | | | | |
| | $750.00 | per year beginning Nov-1-2006 increasing 3% compound per year for life with 12 years certain | $10,644 | $105,865 | $10,832 |
| **IV.** | **TOTALS** | | $474,678 | $2,022,163 | $460,499 |

*Normal Expected Payout only differs from Certain Payout when lifetime payments are involved. Normal Expected Payout reflects the amount of money that would be paid to the claimant if he or she were receiving a lifetime payment and lived his or her normal life expectancy as predicted by the Annuity Mortality Table 1983(a).

Assumptions:
I. The date of birth shown above is correct (if lifetime payments are involved).
II. The annuity premium is received by The Settlement Services Group, LLC on or before the above funding date.
III. Any structured settlement contract would be for physical injury payments as defined in IRC Sec. 104(a)(2) and assigned under Sec. 130.
IV. This is an illustration...not a contract. Should it contain any clerical errors, we reserve the right to correct them.
V. Quote is only valid for 7 days. Benefits may vary after that time. In event of a rate change during the 7 day period, a signed lock-in may be needed within 24 hours to guarantee the benefit.

9545 Kenwood Road, Ste 304 Cincinnati, OH 45242
Ph: 513.794.0400
Fax: 513.936.5186

**The Settlement Services Group**
*Protection through planning*

# PREMIUM REQUEST IMMEDIATE ACTION REQUESTED

**To** John Foley
**From** Scott Harmon
**Date** September 23, 2005
***Subject*** *Important Notice – Premium Request*
**Pages** 1, including this one

Congratulations on settling your case. In order to preserve the benefits elected we must have the premium check(s) in our offices no later than the below stated due date.

| | |
|---|---|
| Claimant(s): | James Avery |
| ***Payable To:*** | ***New York Life Insurance Company*** |
| ***Amount:*** | ***$392,537.00*** |
| Tax I.D. Number: | 13-5582869 |
| ***Due Date:*** | ***October 31, 2005***<br>***This is a critical date!*** |
| Please Mail To: | The Settlement Services Group<br>9545 Kenwood Road, Ste 304<br>Cincinnati, Ohio 45242<br>*Attn: Matthew L. Garretson* |

If the check is not in on time there is a substantial risk that it will cost more to provide the benefits that were agreed upon.

Thank you for your attention to this important matter. If we can assist in any way, please let us know.